NO. 4-06-0243     Filed 4/19/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| RICHARD SHAFER, | ) | No. 06DT3 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Tim P. Olson, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In January 2006, defendant, Richard Shafer, was arrested for driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2004)). Because defendant refused to take a breath test, his driving privileges were summarily suspended by the Secretary of State, pursuant to sections 11-501.1 and 6-208.1(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11-501.1, 6-208.1(a)(1) (West 2004)).

In February 2006, defendant filed a petition to rescind the statutory summary suspension of his driver's license. Following a March 2006 evidentiary hearing, the trial court denied defendant's petition.

Defendant appeals, arguing that the trial court erred by denying his petition because the police officer who arrested him did not have a reasonable, articulable suspicion to justify a

Terry stop (Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) of defendant's car. We disagree and affirm.

## I. BACKGROUND

At the March 2006 hearing on defendant's petition to rescind, the only witness to testify was Jacksonville police officer Jared DeGroot. He testified that he had been a police officer for three years when he was on patrol by himself at approximately 1 a.m. on January 6, 2006. Through his police radio he received information from the police dispatcher that an employee of Wendy's restaurant had called regarding a person who "was causing a disturbance and was intoxicated" while ordering food at the restaurant's drive-thru. DeGroot had no further information about the person, nor did he know the identity of the Wendy's employee who had called in the report.

Wendy's has only one location in the Jacksonville area, and DeGroot responded to that location very quickly after hearing the call from the dispatcher. He saw a car leaving the Wendy's parking lot as he arrived.

DeGroot activated his overhead lights and stopped the car shortly after it left the Wendy's parking lot. Prior to doing so, he did not observe any traffic violations by the car's driver (later identified as defendant). The car came to a complete stop, and defendant waited in the car for DeGroot to

approach it. As DeGroot did so, he saw a Wendy's bag on the front seat.

DeGroot informed defendant of the call that the police had received--"that we believed he caused a disturbance"--and asked defendant about the matter. DeGroot had difficulty understanding defendant and noticed a strong smell of alcohol on defendant's breath. DeGroot suspected that defendant was intoxicated.

Defendant told DeGroot that he had had a couple of beers. DeGroot asked defendant for his driver's license and proof of insurance, and defendant, after a slight delay, complied. DeGroot then arrested defendant for DUI and transported him to the police station.

After DeGroot completed his testimony, the trial court heard counsel's arguments. Defendant argued that all the police had was the anonymous tip of a disturbance with no detail as to what that entailed. Defendant further argued that the police did nothing to corroborate the conclusions of the unknown Wendy's employee that the driver of the car was intoxicated, concluding that "the law is clear that, absent some corroboration, this stop was unjustified at its inception."

The State responded that the police had reasonable suspicion to pull defendant over. The police knew a disturbance had occurred at Wendy's, and given the circumstances, they did

not have time to stop to talk to Wendy's employees while someone who violated the law drove away.

The trial court then engaged in the following dialogue with defense counsel and ruled as follows:

"THE COURT: So if an employee at Wendy's at the drive-thru called the cops and said the guy at the drive-thru just reached, just robbed me and drove off, you mean the cop couldn't stop that guy unless he had a traffic violation first?

[DEFENSE COUNSEL]: No. No, I would disagree with that, I mean, because that's reasonable.

THE COURT: I disagree also. The officer wasn't stopping this guy because of an alcohol violation. He wasn't stopping for driving under the influence of alcohol. He was stopping him because he had a report that there was a disturbance at Wendy's.

The [c]ourt denies the petition to rescind. Court finds that the officer acted reasonably. That's all we can ask for. And everything else flowed from the stop based upon the disturbance, not the intoxication.

Petition denied."

This appeal followed.

## II. ANALYSIS

### A. <u>Terry</u> Stops in General

The Supreme Court of Illinois has explained that to justify a <u>Terry</u> stop, police officers must point to specific, articulable facts that, when considered with natural inferences, make the intrusion reasonable. <u>People v. Ledesma</u>, 206 Ill. 2d 571, 583, 795 N.E.2d 253, 262 (2003), <u>overruled on other grounds by People v. Pitman</u>, 211 Ill. 2d 502, 813 N.E.2d 93 (2004). The court provided further guidance about <u>Terry</u> stops, as follows:

> "We have previously held that a totality-of-circumstances approach will achieve a fairer balance between public and private interests. [Citation.] 'The central issue is *** whether the information, taken in its totality, and interpreted not by technical legal rules but by factual and practical common-sense considerations, would lead a reasonable and prudent person to believe that the person stopped had committed an offense.' [Citation.]" <u>Ledesma</u>, 206 Ill. 2d at 583, 795 N.E.2d at 262.

In <u>State v. Rutzinski</u>, 241 Wis. 2d 729, 738, 623 N.W.2d 516, 521

- 5 -

(2001), the Supreme Court of Wisconsin similarly emphasized that when considering a set of facts to determine whether they could give rise to a reasonable suspicion, courts should apply a commonsense approach to strike a balance between the interests of the individual being stopped and the interests of the state in effectively preventing, detecting, and investigating crimes.

"Reasonable suspicion is a less exacting standard than probable cause." People v. Ward, 371 Ill. App. 3d 382, 412 (2007). In evaluating whether reasonable suspicion exists, a court should objectively consider whether the information known to the officer at the time of the stop "'would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity.'" People v. Delaware, 314 Ill. App. 3d 363, 368, 731 N.E.2d 904, 909 (2000), quoting People v. Walters, 256 Ill. App. 3d 231, 234, 627 N.E.2d 1280, 1283 (1994). In addition, a court "should consider the quality and content of information known to officers as well as the reliability of the source of the information." People v. Lampitok, 207 Ill. 2d 231, 257, 798 N.E.2d 91, 108 (2003).

B. Use of Informants' Tips To Justify Terry Stops

An officer may initiate a Terry stop based on information provided by a third party if the information is reliable and "allows an officer to reasonably infer that a person was involved in criminal activity." People v. Jackson, 348 Ill. App. 3d 719,

- 6 -

729, 810 N.E.2d 542, 553 (2004). In In re J.J., 183 Ill. App. 3d 381, 385-86, 539 N.E.2d 764, 766 (1989), the Second District noted that not all informants' tips should be treated the same and wrote as follows:

> "[T]ips may vary greatly in their value and reliability and *** one simple rule will not cover every situation. Where some tips, completely lacking in indicia of reliability, would warrant either no police response or require further investigation before a stop would be justified, other situations, such as when a victim of a crime seeks immediate police aid and describes his assailant or when a credible informant warns of a specific impending crime, would justify the police making an appropriate response."

In evaluating the reliability of a tip, courts may give greater weight to information provided by an eyewitness or victim of a crime than they would to information provided by persons who do not fall into those categories. Jackson, 348 Ill. App. 3d at 730, 810 N.E.2d at 554; see also People v. Brown, 356 Ill. App. 3d 1088, 1090, 828 N.E.2d 351, 354 (2005) ("a description from an eyewitness is given particularly great weight in determining whether an officer has a reasonable suspicion to justify a

stop").  As the Second District explained in <u>Village of Mundelein</u>
<u>v. Thompson</u>, 341 Ill. App. 3d 842, 852, 793 N.E.2d 996, 1004
(2003), a strong inference that a person is a direct witness to
the offense is more indicative of reliability than a weak infer-
ence that the tipster had a source of inside information.
Further, an informant who is a chance witness "is much less
likely to have a malicious hidden agenda than an informant with a
source of inside information."  <u>Thompson</u>, 341 Ill. App. 3d at
852, 793 N.E.2d at 1004.

The Supreme Court of New Hampshire in <u>State v. Sousa</u>,
151 N.H. 297, 303-04, 855 A.2d 1284, 1290 (2004), recently
provided a list of factors to be considered when evaluating
whether an anonymous tip gives rise to reasonable suspicion and
wrote as follows:

> "First, whether there is a 'sufficient quan-
> tity of information' such as the vehicle's
> make, model, license plate number, location
> and bearing, and 'similar innocent details'
> so that the officer may be certain that the
> vehicle stopped is the one the tipster iden-
> tified.  [Citation.]  Second, the time inter-
> val between the police receiving the tip and
> the police locating the suspect vehicle.
> [Citation.]  Third, whether the tip is based

upon contemporaneous eyewitness observations. [Citations.]  Fourth, whether the tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed an ongoing motor vehicle offense." Sousa, 151 N.H. at 303-04, 855 A.2d at 1290.

C. Informants' Tips Made to Police Emergency Numbers

In Ledesma, 206 Ill. 2d at 583, 795 N.E.2d at 262, our supreme court discussed the use of tips received by telephone as the basis for a Terry stop and wrote as follows:

"Where an informant's tip is received by telephone, it may form the basis for a lawful Terry stop, but the information must bear some indicia of reliability, and the information upon which the police act must establish the requisite quantum of suspicion."

One factor in evaluating the reliability of telephone tips is whether the call was made to a police emergency number. For example, in State v. Golotta, 178 N.J. 205, 219-20, 837 A.2d 359, 367-68 (2003), the Supreme Court of New Jersey explained the reliability of a 9-1-1 call, as follows:

"[W]e agree with the State that a 9-1-1 call carries a fair degree of reliability inasmuch as 'it is hard to conceive that a

- 9 -

person would place himself or herself at risk of a criminal charge by making such a call.' The police maintain records of 9-1-1 calls not only for the purpose of responding to emergency situations but to investigate false or intentionally misleading reports. *** On balance, we are satisfied that in an expanding number of cases[,] the 9-1-1 system provides the police with enough information so that users of that system are not truly anonymous even when they fail to identify themselves by name.

Accordingly, the State stands on firm constitutional ground when it treats the anonymous 9-1-1 caller in the same fashion as it would an identified citizen informant who alerts the police to an emergent situation. *** Analogous to a report offered by a citizen informant, the information imparted by a 9-1-1 caller should not be 'viewed with the same degree of suspicion that applies to a tip by a confidential informant.' [Wildoner v. Borough of Ramsey, 162 N.J. 375, 390, 744 A.2d 1146, 1155 (2000).]"

In a concurring opinion in <u>Florida v. J.L.,</u> 529 U.S. 266, 276, 146 L. Ed. 2d 254, 263-64, 120 S. Ct. 1375, 1381 (2000) (Kennedy, J., concurring), Justice Kennedy discussed the distinction between telephone tips that are "truly anonymous" and those placed to police emergency numbers where the caller's identity may at some point become known:

> "If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip. ***
>
> Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to make false reports to the police [citations], and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips."

A recent concurring opinion by a Wisconsin Supreme

Court justice clarified this point, as follows:

> "The recorded call and its subsequent transcript show both the caller's basis of information and the caller's reliability. The fact that the police agency either knew the identity of the caller or had the means to discover the caller's identity enhances the caller's credibility. The police were in a position to go back to their source. If the information provided had turned out to be untrue, the police would have been able to follow up and confront the caller, demand an explanation, and pursue criminal charges." State v. Williams, 241 Wis. 2d 631, 670-71, 623 N.W.2d 106, 124 (2001) (Prosser, J., concurring).

In People v. Polander, 41 P.3d 698, 702-03 (Colo. 2001), we find further support for viewing informants' tips to police emergency numbers as having greater indicia of reliability than anonymous tips. In that case, the Supreme Court of Colorado decided that a late-night tip from an unnamed Burger King employee reporting that (1) two vehicles had been parked in the Burger King parking lot for about 30 minutes and (2) an employee had observed the occupants passing a marijuana pipe back and

forth was sufficient to provide articulable suspicion for an investigatory stop of the occupants of one of the vehicles. In so concluding, the court noted that "[i]t has long been recognized that assessing the veracity of average citizens who may be victims or witnesses reporting crime does not pose the same problem as assessing the veracity of informants from the criminal milieu." Polander, 41 P.3d at 703. Citing Justice Kennedy's concurring opinion in J.L., the court further noted that it has been accepted that someone providing the police with a tip who identified himself made it possible to determine whether he had an ulterior motive for reporting, thereby placing himself at some risk of reprisal or of jeopardy for false reporting. Thus, the court opined that placing one's anonymity at risk is a factor to be considered in weighing reliability. Polander, 41 P.3d at 703-04. The court concluded by reversing the trial court's order suppressing evidence and statements as the fruit of an illegal investigatory stop, noting that the Burger King caller in this case had provided "significant information about both his or her veracity and basis of knowledge." Polander, 41 P.3d at 704.

### D. Lessened Corroboration of Informants' Tips Concerning Suspected Drunk Drivers

Some courts have concluded that less rigorous corroboration of tips is needed when the tip concerns a suspected drunk driver. An intoxicated person behind the wheel of a car presents an imminent danger to the public that is difficult to thwart by

- 13 -

means other than a <u>Terry</u> stop.  See, for example, <u>United States v. Wheat</u>, 278 F.3d 722, 732 n.8 (8th Cir. 2001) ("The rationale for allowing less rigorous corroboration of tips alleging erratic driving is that the imminent danger present in this context is substantially greater (and more difficult to thwart by less intrusive means) than the danger posed by a person in possession of a concealed handgun"); <u>State v. Tucker</u>, 19 Kan. App. 2d 920, 931, 878 P.2d 855, 864 (1994) ("[t]he risk of danger presented to the public by a drunken driver is so great that we cannot afford to impose strict, verifiable conditions on an anonymous tip before an investigatory stop can be made in response to such a tip"); <u>State v. Stolte</u>, 991 S.W.2d 336, 343 (Tex. Ct. App. 1999) (describing the "immediate threat to public safety" caused by drunk drivers in upholding an investigative stop based on information provided by an informant's tip).

In <u>Rutzinski</u>, the Supreme Court of Wisconsin explained that no blanket rule exists excepting tips alleging drunk driving from normal reliability requirements.  Nonetheless, that court acknowledged the Supreme Court's caveat that "'extraordinary dangers sometimes justify [extraordinary] precautions.'" <u>Rutzinski</u>, 241 Wis. 2d at 751, 623 N.W.2d at 527, quoting <u>J.L.</u>, 529 U.S. at 272, 146 L. Ed. 2d at 261, 120 S. Ct. at 1379.  The <u>Rutzinski</u> court accordingly rejected the defendant's argument that the arresting officer should have waited until he personally

- 14 -

observed signs that the defendant may have been intoxicated before initiating the traffic stop.  Noting that in 1999, the United States suffered 15,786 fatalities in alcohol-related traffic accidents, "an average of 1 fatality every 33 minutes," the Rutzinski court quoted approvingly from the Vermont Supreme Court in State v. Boyea, 765 A.2d 862, 867 (Vt. 2000), as follows:

> "'In contrast to the report of an individual in possession of a gun [as in J.L.], an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action. In the case of a concealed gun, the possession itself might be legal, and the police could, in any event, surreptitiously observe the individual for a reasonable period of time without running the risk of death or injury with every passing moment.  An officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury.  Indeed, a drunk driver is not at all unlike a "bomb," and a mobile one at that.'"
> Rutzinski, 241 Wis. 2d at 749, 623 N.W.2d at

526.

The Supreme Court of New Jersey in <u>Golotta</u> expressed similar concerns when it wrote that a factor warranting a reduced degree of corroboration is the reality that intoxicated drivers pose a significant risk to themselves and to the public. <u>Golotta</u>, 178 N.J. at 221, 837 A.2d at 368. Reaffirming its earlier description of such drivers as "'moving time bombs'" (see <u>State v. Tischio</u>, 107 N.J. 504, 519, 527 A.2d 388, 396 (1987)), the <u>Golotta</u> court wrote the following:

> "Because the Constitution 'is not a suicide pact' [citation], it permits courts to consider exigency and public safety when evaluating the reasonableness of police conduct. *** The risk to life and safety posed by an intoxicated or erratic driver convinces us that it is reasonable and, therefore, constitutional for the police to act on information furnished by an anonymous 9-1-1 caller without the level of corroboration that traditionally would be necessary to uphold such action." <u>Golotta</u>, 178 N.J. at 221, 837 A.2d at 368-69.

Because we agree with the holdings and analyses of the aforementioned cases, we hold that informants' tips regarding

possible incidents of drunk driving require less rigorous corroboration than tips concerning matters presenting less imminent danger to the public.

### E. The <u>Terry</u> Stop in This Case

Defendant argues that the trial court erred by denying his petition to rescind the statutory summary suspension because DeGroot did not have a reasonable, articulable suspicion to justify a <u>Terry</u> stop of defendant's car. Specifically, he contends that (1) the statement of the Wendy's employee that DeGroot heard from dispatch did not bear sufficient indicia of reliability to establish the requisite quantum of suspicion and (2) DeGroot acted solely upon a conclusory and uncorroborated opinion of an unknown Wendy's employee that an intoxicated patron at the restaurant's drive-thru was causing a disturbance. For the following reasons, we disagree.

### 1. <u>Standard</u> <u>of</u> <u>Review</u>

Generally, this court will not disturb a trial court's decision to deny a petition to rescind statutory summary suspension unless that decision was against the manifest weight of the evidence. <u>People v. Rozela</u>, 345 Ill. App. 3d 217, 222, 802 N.E.2d 372, 376 (2003). However, because the trial court's ruling in this case did not involve a determination of witness credibility, this court will review it <u>de</u> <u>novo</u>. <u>De</u> <u>novo</u> review is appropriate when neither facts nor credibility of witnesses is

- 17 -

questioned.  Ledesma, 206 Ill. 2d at 576, 795 N.E.2d at 258.

### 2. Defendant's Claim That the Tip Was Unreliable

Defendant first contends that the statement of the Wendy's employee that DeGroot heard from dispatch did not bear sufficient indicia of reliability to establish the requisite quantum of suspicion.  We disagree.

Initially, we disagree with defendant's characterization of the Wendy's employee as an "anonymous" informant.  The Jacksonville police knew that the call they had received at 1 a.m. came from the only Wendy's restaurant in the Jacksonville area.  The caller identified him or herself as an employee of Wendy's.  We agree with the decisions earlier cited that an emergency call to police should not be viewed as an "anonymous" tip or with the skepticism applied to tips provided by confidential informants.  See, for example, Golotta, 178 N.J. at 219, 837 A.2d at 367 (noting that calls to police emergency lines provide the police with enough information so that such callers are not truly anonymous).

Further, using the set of factors set forth in Sousa, 151 N.H. at 303-04, 855 A.2d at 1290, we conclude that the tip in this case was reliable.  First, the timing of the tip provided DeGroot with sufficient basis for believing that the car he was stopping shortly after it pulled out of the Wendy's parking lot was the one the tipster had called about.  We note that defendant

- 18 -

does not argue that any other cars were in the parking lot or that DeGroot may have followed the wrong car. Second, the time interval between DeGroot's receiving the tip and his locating the suspect car could hardly be smaller. Third, the tip clearly was based upon contemporaneous eyewitness observations by the Wendy's employee at the drive-thru window. And fourth, the tip was sufficiently detailed to permit a reasonable inference that the tipster had actually witnessed what he or she described--namely, that defendant had created a disturbance and was intoxicated at the drive-thru window.

On this latter point, we note that transactions at restaurant drive-thru windows occur between individuals in close enough proximity that a hand-to-hand exchange of food and money is made. The record is silent as to just what defendant did during this transaction that caused the Wendy's employee enough concern to call the Jacksonville police, but the closeness of the quarters between the employee and defendant supports the reliability of the employee's observations. That is, the employee would clearly be in a position to determine, both from defendant's speech and odor, that he was intoxicated. Further, defendant's "creating a disturbance" during the transaction would serve to corroborate the employee's other views about defendant's intoxication.

### 3. Defendant's Claim That DeGroot Acted Solely Upon a Conclusory and Uncorroborated Opinion

Defendant also contends that the Wendy's employee who called the Jacksonville police "provided no specific information describing the disturbance allegedly caused by the customer, nor did the caller factually support his or her opinion that the customer was intoxicated." Defendant thus asserts that DeGroot's decision to stop defendant's car was based on nothing more than a hunch. For the reasons we have already set forth in rejecting defendant's contention that the tip was unreliable, we disagree. Also, as previously stated, informants' tips regarding possible incidents of drunk driving require less rigorous corroboration.

We thus conclude that the telephone tip provided DeGroot with the requisite quantum of suspicion to justify the <u>Terry</u> stop of defendant's car. Accordingly, we further conclude that the trial court did not err by denying defendant's petition to rescind the statutory summary suspension.

In so concluding, we reject defendant's claim that DeGroot should have followed defendant's car until he observed evidence of impaired driving. As earlier discussed, DUI is sufficiently dangerous to the public that it would have been irresponsible for DeGroot, having received the tip, to simply follow defendant's car and wait for potentially catastrophic results to occur.

### 4. <u>The Reasons Why DeGroot Stopped Defendant's Car</u>

The record contains no explicit statement by DeGroot

- 20 -

that he stopped defendant's car because he feared defendant was driving drunk, based upon the information called in by the Wendy's employee. Had DeGroot been asked, he might even have testified that he stopped defendant's car was because he believed that defendant had caused a disturbance at the drive-thru window, not because of any concern that defendant was a possible drunk driver. None of that matters. Nor does it matter that the trial court indicated that it believed DeGroot stopped defendant's car "based upon the [reported] disturbance, not the intoxication."

The United States Supreme Court in <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153, 160 L. Ed. 2d 537, 545, 125 S. Ct. 588, 593-94 (2004), recently reiterated

> "that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. [Citations.] That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."

The Court noted that "'evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.'" <u>Devenpeck</u>, 543 U.S. at 153, 160 L. Ed. 2d at 545, 125 S. Ct. at 593-94, quoting <u>Horton v. California</u>, 496

- 21 -

U.S. 128, 138, 110 L. Ed. 2d 112, 124, 110 S. Ct. 2301, 2308-09 (1990).

Although the issue in <u>Devenpeck</u> was whether probable cause existed, we see no reason why the Court's analysis should not also apply to the issue in this case--namely, whether the officer had a reasonable, articulable suspicion to justify a <u>Terry</u> stop.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON and COOK, JJ., concur.