No. 3--06--0633
(Consolidated with Nos. 3--06--0634 and 3--06--0635)

Filed April 15, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court<br>) of the 9th Judicial Circuit,<br>) McDonough County, Illinois, |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) Nos. 05--CF--188, 05--CF--189,<br>) and 05--CF--190 |
| | ) |
| CHRISTOPHER A. MATOUS,<br>WESLEY E. MILLER, and<br>BRUCE E. EGLEY, | )<br>)<br>) Honorable |
| | ) William D. Henderson, |
| Defendants-Appellees. | ) Judge, Presiding. |

JUSTICE SCHMIDT delivered the opinion of the court:

In separate cases, the State charged each of the defendants, Christopher A. Matous, Wesley E. Miller, and Bruce E. Egley, with two counts of unlawful possession of methamphetamine manufacturing chemicals (pseudoephedrine) (720 ILCS 570/401 (West 2004)). Each of the defendants filed motions to suppress the evidence in their respective cases. The trial court held a consolidated hearing on the motions, which the court granted. On appeal, the State argues that the trial court erred by granting the defendants' motions to suppress. We reverse and remand.

BACKGROUND

The event in question took place in Macomb on August 29, 2005. At the suppression hearing, Joseph Moon testified that on

August 29, he was an Illinois state trooper and a canine handler. At approximately 6 p.m., Moon was on patrol when he heard a dispatch from the McDonough County sheriff's office over his squad car's radio concerning "possible methamphetamine chemical purchases." The dispatcher said "that a Hy-Vee Pharmacy had called them advising that two males had purchased boxes of pseudoephedrine pills and got into the same vehicle, which was a purple Mercury Tracer with Iowa registration." The dispatcher then stated the vehicle's Iowa license plate number.

Moon said that the dispatcher reported that the men "each purchased pseudoephedrine, a box of pseudoephedrine pills and got into the same vehicle." When Moon was asked, "How many boxes of pseudoephedrine?," Moon replied, "I believe two total." The dispatcher described the two individuals as (1) a white male in his forties with grey or white hair in a ponytail, wearing a white tee-shirt; and (2) a white male in his twenties. During the hearing, Moon noted that he met with the Hy-Vee pharmacist and viewed videotapes of the defendants after their arrest.

At approximately 7 or 7:30 p.m., Moon observed a purple Mercury Tracer traveling on U.S. 136. The vehicle's Iowa license plate number matched the number given by the dispatcher. Moon said the car had three occupants, two of whom matched the dispatcher's descriptions of the individuals at the Hy-Vee store. Moon noted that the driver of the car appeared to be in his forties, had a white ponytail, and was wearing a white tee-shirt. According to Moon, the rear passenger was "a younger white male."

2

Moon followed the Mercury in his squad car. Moon said, "I observed the vehicle make a traffic violation and called in a stop and activated my emergency lights." When he was asked to describe the violation, Moon stated that the vehicle "[c]rossed the center line." Later, Moon testified that there were two solid yellow lines in the center of the highway. Moon observed the vehicle drive "over the far right yellow line at the time of the offense." He said that the vehicle did not cross the second yellow line but, rather, crossed "just one of them." Moon asserted that he would have stopped the vehicle on the basis of the information from the dispatcher regardless of the traffic violation.

After the vehicle stopped, Moon asked the driver for his driver's license and proof of insurance, which the driver produced. The driver was defendant Egley. Moon advised Egley that he had stopped the vehicle because of improper lane usage and "the intelligence information of the *** possible manufacturing of methamphetamine." Egley replied that "his windshield was dirty, and when he rounded the corner and the sunlight caught the windshield, it was obstructed and he couldn't see out of it."

Moon asked Egley to join him in the squad car, where Moon began to write warning tickets for improper lane usage and an obstructed view. While writing the warnings, Moon asked Egley if he had stopped anywhere in Macomb. Egley asserted that he had not stopped anywhere. Moon testified that he considered Egley's

3

answer to be deceptive because of the information from the dispatcher that the vehicle had stopped at the Hy-Vee.

Before completing the warning tickets, Moon advised Egley that he was going to have his dog sniff the exterior of the Mercury. At that time, the two passengers were still inside the car. When the dog sniffed the outside of the car, it alerted to the driver's side door seam, the trunk lid, and the passenger side door seam. Moon asked the passengers to exit the vehicle, and he searched the car's passenger area. The officer found two bags containing a total of approximately 28 or 29 boxes of pseudoephedrine. One bag was on the front passenger floorboard, and the other bag was on the rear passenger floorboard. Moon then arrested the three defendants and advised them of their Miranda rights.

Moon stated that he was writing the warning tickets for approximately 10 to 12 minutes. He said that about 15 to 20 minutes elapsed from the time he stopped the vehicle until he took the defendants into custody. Moon testified that during the stop he did not tell any of the three defendants that he was free to go.

The officer acknowledged that the dog was not trained to alert to pseudoephedrine. The dog was trained, however, to alert to methamphetamine, among other illegal drugs. After he was arrested, defendant Matous admitted to Moon "that he had used methamphetamine sometime within the [previous] 24 hours." Moon

4

speculated that the dog may have alerted to the residual odor of methamphetamine while Matous was in the car.

After the presentation of the evidence, the court heard closing arguments. The attorney for defendant Miller argued, in part, that Moon was not justified in relying on the information from the dispatcher because of what the attorney called "the Lawson and Willock doctrine." Defense counsel cited the holdings of People v. Lawson, 298 Ill. App. 3d 997, 700 N.E.2d 125 (1998), and People v. Willock, No. 3--99--0227 (2000) (unpublished order under Supreme Court Rule 23), for this doctrine. The court overruled the prosecutor's objection to defense counsel's reliance upon a Rule 23 decision.

At the conclusion of the suppression hearing, the court took the matter under advisement. The court first issued an opinion letter. Later, the court issued its written final order, in which it incorporated the opinion letter by reference. In the letter, the judge said, "My decision is primarily based on [Miller's attorney's] *** 'Lawson-Willock Doctrine.' " The court then stated the following:

"This was an investigatory stop plain and simple. The officer candidly testified that based on the radio dispatch he was going to stop the vehicle in which the defendants were traveling irrespective of any traffic violation. He issued warnings for the alleged lane usage and obstructed windshield, but had he charged

5

these violations, the driver would have been acquitted on the driving evidence presented."

Next, the judge quoted facts and analysis from Willock, for which he had been the trial judge. The judge noted that in Willock, this court said that when an officer relies upon a radio dispatch in arresting a defendant, at a suppression hearing the State must produce evidence that the officer who issued the dispatch had probable cause to arrest the defendant.

The judge then stated the following:

"Neither the dispatcher nor the [Hy-Vee] pharmacist [was] called as a witness by the State to provide proof of reliability of the source or to supply specific, articulable facts to warrant the stop. Under the 'Lawson-Willock Doctrine' this omission in and of itself was fatal. I also note that given the paucity of incriminating evidence upon which the dispatch apparently relied, it is doubtful whether the State could have established the reliability of its source even with their testimony."

The court granted the motions to suppress, and the State appealed.

ANALYSIS

The State contends that the trial court erred by granting the motions to suppress.

Initially, we note that neither defense counsel nor the trial court should have relied on our unpublished Rule 23 order

6

in <u>Willock</u> as precedential authority. Rule 23(e) states that "[a]n unpublished order of the court is not precedential and may not be cited by any party except to support contentions of double jeopardy, <u>res judicata</u>, collateral estoppel or law of the case." 166 Ill. 2d R. 23(e). In this case, defense counsel was not citing <u>Willock</u> to support a contention of double jeopardy, <u>res judicata</u>, collateral estoppel, or law of the case. Therefore, it was improper for defense counsel to cite, and for the court to consider, <u>Willock</u> as precedential authority. There can be no "<u>Lawson</u>-<u>Willock</u> doctrine."

On appeal, a trial court's factual findings concerning a motion to suppress will be upheld unless they are against the manifest weight of the evidence. <u>People v. McCarty</u>, 223 Ill. 2d 109, 858 N.E.2d 15 (2006). The ultimate decision, however, concerning whether the evidence should have been suppressed is a question of law, which we review <u>de novo</u>. <u>McCarty</u>, 223 Ill. 2d 109, 858 N.E.2d 15.

A peace officer may conduct a lawful traffic stop based on probable cause that the driver of the vehicle has committed a traffic violation. <u>Illinois v. Caballes</u>, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). An officer also may temporarily detain a person with less than probable cause, for the officer's safety, if the officer has reasonable, articulable suspicion of the defendant's criminal activity. <u>Terry v. Ohio</u>, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The United States Supreme Court applied the principles of <u>Terry</u> to traffic

7

stops in Delaware v. Prouse, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). An officer may conduct a Terry traffic stop if the officer has a reasonable, articulable suspicion that (1) the driver is unlicensed; (2) the vehicle is not registered; or (3) that either the vehicle, or an occupant of the vehicle, is subject to seizure for violation of a law. Prouse, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391.

In this case, we rule that Moon had probable cause to stop the defendants' vehicle because of a lane violation. See Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834. In Illinois, "[w]here *** markings are in place to define a no-passing zone *** no driver may at any time drive *** on the left side of any pavement striping designed to mark such no-passing zone." 625 ILCS 5/11--707(b) (West 2004).

In the instant case, Moon observed the vehicle in question cross one of the solid yellow center lines of the highway. Thus, the car was on the left side of pavement striping designed to mark a no-passing zone. See 625 ILCS 5/11--707(b) (West 2004). Therefore, Moon had probable cause to stop the car for violation of section 11--707(b) of the Illinois Vehicle Code (625 ILCS 5/11--707(b) (West 2004)).

Additionally, we hold that Moon was justified in conducting a Terry stop of the vehicle because the officer had a reasonable, articulable suspicion that occupants of the vehicle were subject to seizure for violation of a law. See Prouse, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391. Moon's reasonable, articulable

8

suspicion was based on information from the sheriff office's dispatcher, which, in turn, came from the Hy-Vee pharmacist.

We note that the trial court in this case cited <u>Willock</u> and <u>Lawson</u> for the general proposition that the State's failure to call the dispatcher or the pharmacist to testify was fatal to its case. As we noted above, the court should not have cited <u>Willock</u> because it was a Rule 23 order. Furthermore, <u>Lawson</u>, which only concerned an arrest, and <u>People v. Scott</u>, 249 Ill. App. 3d 597, 619 N.E.2d 809 (1993), which addressed both arrests and <u>Terry</u> stops, do not stand for the general proposition that it is always fatal to the State's case to fail to produce such testimony. As we explain below, the trial court's statement concerning the State's burden was overly broad.

As the moving party in a suppression hearing, the defendant has the initial burden to prove that his seizure was unlawful or impermissible, that is, that the police lacked either probable cause to arrest or a reasonable articulable suspicion to temporarily detain the defendant. <u>Scott</u>, 249 Ill. App. 3d 597, 619 N.E.2d 809. If the defendant makes a <u>prima</u> <u>facie</u> showing that he was doing nothing unusual to justify his seizure by the police, the burden of going forward then shifts to the State. <u>Scott</u>, 249 Ill. App. 3d 597, 619 N.E.2d 809.

At the suppression hearing in this case, the court stated that the State's failure to call the dispatcher or the pharmacist to testify was fatal to its case. However, the court first should have found that the defendants had made a <u>prima</u> <u>facie</u>

9

showing that they were doing nothing unusual to justify their seizure and that the burden, therefore, had shifted to the State.

In the instant case, the defendants argue that Moon was not justified in conducting a traffic stop because the information Moon heard over the radio from the sheriff's dispatcher came from an anonymous tip. Put simply, the defendants are incorrect because the source of the information was not anonymous but, rather, was identified as the Hy-Vee pharmacy, i.e., a pharmacist at the Hy-Vee.

We find two cases from the Illinois Appellate Court, Fourth District, to be instructive concerning whether a source of information is anonymous in the context of a Terry traffic stop. In People v. Shafer, 372 Ill. App. 3d 1044, 868 N.E.2d 359 (2007), a Wendy's employee called the police to report the defendant's intoxicated behavior at the drive-through window, as well as detailed information about the defendant's vehicle. An officer conducted a Terry stop of the defendant's vehicle based on the information from the Wendy's employee, as related by the dispatcher. The Shafer court ruled that the Wendy's employee was not an anonymous source.

In People v. Ewing, 377 Ill. App. 3d 585, 880 N.E.2d 587 (2007), a veterinary clinic employee called the police to report the defendant's intoxicated behavior at the clinic, as well as detailed information about the defendant's vehicle. An officer conducted a Terry stop of the defendant's vehicle based on the information from the clinic's employee, as related by the

10

dispatcher.  The Ewing court also ruled that the clinic's employee was not an anonymous source.

In the present case, a Hy-Vee pharmacist called the sheriff's department to report the suspicious circumstances of two of the defendants' pseudoephedrine purchases, as well as detailed information about the defendants' vehicle.  Moon conducted a Terry stop of the defendants' vehicle based on the information from the pharmacist, as related by the dispatcher.  Under Shafer and Ewing, we rule that the pharmacist was not an anonymous source.

Furthermore, we note that the record shows that Moon later met with the pharmacist who had called the dispatcher.  The pharmacist's name appears in the record in this context.  It is possible that Moon was able to ask for the pharmacist by name because the pharmacist gave his or her name to the dispatcher. It is equally possible that the pharmacist did not identify himself or herself by name to the dispatcher, and the police learned the pharmacist's name later after asking the Hy-Vee pharmacy which pharmacist had made the call.  In either event, we cannot say that the pharmacist was an anonymous source merely because Moon did not know the pharmacist's name at the time of the traffic stop.

The trial court in this case relied on Lawson, 298 Ill. App. 3d 997, 700 N.E.2d 125, in finding that there was insufficient cause to stop the defendant's car for unlawful possession of methamphetamine chemicals.  In Lawson, at the suppression

11

hearing, the arresting officer testified that he heard over the radio that a robbery had taken place in a business establishment and that the robber had shot a man. The broadcast gave a description of the robber. While in his squad car, the officer saw the defendant, who fit the description of the robber, and arrested him. The Lawson court ruled that even though the officer was justified in relying on the radio description to arrest the defendant, the State was required to present proof of the basis of the radio broadcast in order to survive the motion to suppress.

Lawson is factually distinguishable from the present case for two reasons. In Lawson, the evidence did not include the basis of the radio broadcast. In this case, the evidence included the basis of the dispatcher's broadcast, i.e., a pharmacist from Hy-Vee. Additionally, Lawson concerned the validity of the defendant's arrest. As we noted above, the issue in this case is the validity of the initial traffic stop rather than the validity of the defendants' arrests.

The defendants submit that in order to make a traffic stop based on information outside the officer's personal knowledge, the information must have some indication of reliability, citing People v. Sparks, 315 Ill. App. 3d 786, 734 N.E.2d 216 (2000), and People v. Brown, 343 Ill. App. 3d 617, 798 N.E.2d 800 (2003). Sparks and Brown, however, concerned information from an anonymous source, and therefore the information lacked reliability. As we stated above, this case does not concern

12

information from an anonymous source. Therefore, we find <u>Sparks</u> and <u>Brown</u> to be inapplicable to the present case.

The defendants assert that the pharmacist's information about two individuals purchasing two boxes of pseudoephedrine and getting into the same car did not constitute reasonable, articulable suspicion of criminal activity because it is not a crime to possess such a small quantity of pseudoephedrine. See 720 ILCS 648/20(c) (West 2006). We note that the statute relied upon by the defendants was not in effect at the time of the traffic stop. See Pub. Act 94--694, eff. January 15, 2006. Moreover, the issue is not whether possessing the two boxes constituted a crime but, rather, whether such possession, and the circumstances attending their purchase, raised a reasonable, articulable suspicion of criminal activity. See <u>Prouse</u>, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391. We find that such behavior was sufficient to raise such a reasonable, articulable suspicion.

Moon testified that employees of local business establishments had been asked to report the purchases of the chemical components of methamphetamine. In this case, the pharmacist reported such purchases, and the suspicious circumstances surrounding the purchases. The pharmacist noted that two of the defendants each purchased a box of pseudoephedrine and got into the same car. The pharmacist's report of the defendants' behavior formed the basis of Moon's reasonable, articulable suspicion.

13

Moreover, we recognize that pharmacists are in the business of selling drugs to their customers. It is against a pharmacist's financial interest to call the police to arrest customers. It is also common knowledge that pharmacists have been alerted to the use of pseudoephedrine in making methamphetamine. Therefore, the fact that the defendants' behavior raised the pharmacist's suspicion such that the pharmacist would call the police to report the customers was an indication of the reliability of the pharmacist's information.

Having established that the initial traffic stop was proper, we conclude that the defendants cannot show that the evidence should have been suppressed. Under Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834, (1) the dog sniff in this case was not a search; (2) Moon was justified in searching the vehicle after the dog alerted; and (3) Moon's seizure of the evidence was proper because it was contraband.

In summary, Moon had probable cause to stop the vehicle for a lane violation. Additionally, the officer had a reasonable, articulable suspicion to conduct a Terry stop of the car because of the information from the dispatcher. The officer's search of the vehicle and seizure of contraband found within the vehicle were justified after the officer's drug-sniffing dog alerted. Therefore, we hold that the trial court erred by granting the defendants' motions to suppress.

CONCLUSION

14

For the foregoing reasons, we reverse the judgment of the McDonough County circuit court and remand the cause for further proceedings.

Reversed and remanded.

O'BRIEN, J., concurs.

CARTER, J., specially concurring:

I concur with the majority's legal analysis and decision.  I am specially concurring because of the comments regarding the trial court's reference to People v. Willock, No. 3--99--0227 (October 6, 2000) (unpublished order under Supreme Court Rule 23).  As noted in the majority opinion, the trial judge in this case had been the trial judge in Willock, where his trial decision was reversed.  Although it is well known that an unpublished order of the appellate court is not precedential (166 Ill. 2d R. 23(e)), it is not unusual, nor surprising, for a trial judge to refer to one of his cases, not as precedential, but perhaps as persuasive authority.  The whole unpublished-opinion doctrine has always raised the question, how much deference does a trial judge give to an appellate court's decision on an issue that comes before him again when, like it or not, he has already been given guidance by the appellate court on the same or similar issues.  The judge in that situation is obviously under no obligation to follow the unpublished decision because it lacks the force of true precedent.  However, unlike the decision of a court of another jurisdiction, which normally depends upon the case's legal reasoning for its influence, an unpublished decision

15

on an issue from the same trial judge tends to have a type of hybrid extra persuasive influence.  That kind of unpublished decision of a superior court in the same judicial hierarchy causes the trial judge to consider it in the real world.  In my experience, trial judges do not simply ignore cases from the appellate court, especially when they were the trial judge, regardless of whether the case was published or unpublished.  That approach is especially true when the published opinions on the issues perhaps give less guidance than the unpublished decision.  Thus, in this case, where this panel of the appellate court is treating an issue differently than a previous panel in an unpublished decision, it is understandable that at the trial level, the judge made a reference to the earlier case.

For the reasons stated, I specially concur.

16