# Illinois Official Reports

## Appellate Court

*People v. Meo*, **2018 IL App (2d) 170135**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOSEPH P. MEO, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-17-0135 |
| Filed | March 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, Nos. 16-DT-455, 16-CM-1269; the Hon. Philip G. Montgomery, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Lawrence M. Bauer, and Barry W. Jacobs, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Dale J. Clark, of Slingerland & Clark, P.C., of Sycamore, for appellee. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices McLaren and Burke concurred in the judgment and opinion. |

¶ 1        Defendant, Joseph P. Meo, was arrested and charged with driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2016)) and obstructing a peace officer (720 ILCS 5/31-1 (West 2016)). Defendant's driving privileges were summarily suspended (625 ILCS 5/11-501.1(a) (West 2016)). Defendant petitioned to rescind the summary suspension. In addition, defendant filed a motion to quash his arrest and suppress evidence, arguing that there was no basis for the stop and that the arrest was not supported by probable cause. Following a hearing, the trial court granted defendant's motion.[1] The State filed a certificate of impairment and timely appealed (see Ill. S. Ct. R. 604(a)(1) (eff. Mar. 8, 2016)). We reverse and remand.

¶ 2                                        I. BACKGROUND

¶ 3        A hearing on defendant's motion to quash his arrest and suppress evidence took place on February 1, 2017. Sycamore police officer Greyson Scott was the sole witness. Scott testified that he had been a police officer for just over two years. On December 10, 2016, at about 8:30 p.m., Scott was dispatched to Casey's General Store (Casey's), located at the intersection of Plank Road and Main Street, to investigate a report of a possible drunk driver. It was snowing heavily at the time. According to Scott, a clerk at Casey's called dispatch to report a possible drunk driver in the building. Based on the clerk's report, dispatch then advised Scott that "the male driver was driving a white Scion. He had driven up to the front of the building, hitting the curb, going over the curb, and the store clerk described it as almost going into the building." Scott testified that, although he never spoke directly with the clerk, his sergeant did. After receiving the call from dispatch, Scott drove to Casey's, but rather than entering the Casey's parking lot, Scott parked his squad car in a parking lot east of Casey's so that he would have a better view of the vehicles parked in the Casey's parking lot. Upon his arrival, Scott saw a white Scion parked in the Casey's parking lot, and "fairly soon" thereafter he saw a white male, later identified as defendant, enter the vehicle.

¶ 4        Scott testified that defendant proceeded to exit the Casey's parking lot, heading toward Plank Road, with his vehicle's headlights on, and drove in front of Scott's vehicle. According to Scott, defendant was on a frontage road that was not marked as a city roadway or maintained by the city; it was an "exit way" that provided access to Plank Road from Casey's. As defendant drove past Scott's squad car, Scott observed defendant's headlights shut off for a "brief time" and then turn back on. Scott estimated that the headlights were off for "one to four seconds." Scott followed defendant's vehicle as it proceeded from Casey's and onto Plank Road. Scott observed defendant properly signal before entering Plank Road. Scott followed defendant's vehicle as it proceeded west toward the intersection of North Main Street and Plank Road. Scott observed defendant properly enter the left turn lane and properly signal before turning left onto North Main Street. After following defendant for about 30 seconds and observing defendant commit no traffic violations, Scott activated the lights on his squad car, and defendant stopped his vehicle appropriately. Scott stopped defendant's vehicle based on the blinking headlights and the original call. A video recording was made from Scott's squad car camera from just before the time that defendant's vehicle passed in front of Scott at Casey's

---

[1]Defendant's petition to rescind the summary suspension of his driving privileges was subsequently granted by agreement of the parties and is not at issue in this appeal.

until the time that Scott arrested defendant for DUI. The video was played for the court and entered into evidence.

¶ 5    Scott testified that, after pulling over defendant's vehicle, he approached the vehicle and spoke with defendant through the open driver's-side window. While speaking to defendant, Scott smelled alcohol on defendant's breath and noted that defendant's "eyes were glassy and bloodshot, his speech was thick-tongued and slurred." Defendant told Scott that he drank three beers about six or seven hours earlier. Scott asked defendant for his driver's license and proof of insurance. According to Scott, defendant had a hard time getting his driver's license out of his wallet and "fumbled his wallet a few times." Scott testified: "He literally had it in his hands and he dropped it out onto his lap and picked it back up and was kind of using multiple fingers to kind of manipulate the wallet in order to open it correctly." Scott testified that the driver's license was located behind a plastic flap and that it took defendant a few tries to pull the license out of the wallet. Scott stated that defendant also pulled a credit card out of the wallet and handed him the credit card instead of his insurance card.

¶ 6    Scott testified that he decided to perform field sobriety tests on defendant and asked him to step out of his vehicle. Because of the heavy snowfall and wind, Scott asked defendant to accompany him to a nearby Jewel pharmacy drive-through pickup area, with an overhang, so that they could be protected from the snow. Scott testified that, when he asked defendant to exit and lock his vehicle, defendant did so. Scott agreed that he wrote in his police report that defendant swayed and seemed unbalanced as he walked. Scott also agreed, however, that the video showed that defendant had no difficulty walking toward the police car in the deep snow. The video also showed that defendant, while walking toward the police vehicle, dropped his keys and was able to pick them up without difficulty. In addition, Scott agreed that, although he testified that he smelled alcohol on defendant's breath, he made no such mention on the video.

¶ 7    Scott transported defendant to Jewel to perform the field sobriety tests. The area under the overhang was mostly dry with just some blowing snow on the pavement. Scott testified that he asked defendant for consent to perform the tests and that defendant agreed to participate. Ultimately, defendant did not perform the tests. Scott testified that he had instructed defendant four times on how to perform the horizontal gaze nystagmus (HGN) test. Defendant told Scott several times that he had some physical limitations due to a stroke. The video shows defendant telling Scott that he suffered a stroke a few months ago. As Scott was instructing defendant on how to perform the HGN test, defendant told Scott that he needed to have things repeated and asked Scott to speak slower. Defendant told him that he did not understand. During the test, defendant again told Scott that he had had a stroke and that he could not do a lot of things. Scott testified that defendant seemed very confused. Scott agreed that defendant did not have any trouble removing his glasses for the test and that defendant did not sway or stumble as he stood before him during the test. Scott repeatedly attempted to have defendant follow the top of his finger using only his eyes. Defendant told Scott that he could be having a stroke. When Scott asked defendant if he needed an ambulance, defendant responded, "I don't know."

¶ 8    Scott testified that he had offered nonstandardized field sobriety tests to defendant because defendant was unable to complete the HGN test. The video shows Scott asking defendant whether he had any physical limitations that would prevent him from performing the one-leg-stand test or the walk-and-turn test. Defendant said yes, because his legs had given out during his stroke. Scott asked defendant if he wanted to attempt the tests, and when defendant

did not give a responsive answer, Scott told defendant that he assumed that the answer was no. Scott then offered to have defendant perform the alphabet test and asked defendant if he knew his A-B-Cs. Defendant responded that he "lost all that over the years," but then quickly asked, "A-B-C-D-E-F-G-H?" Scott asked defendant to recite the alphabet, starting at B and ending with O. Defendant said that he did not want to try it. When Scott asked defendant to count, defendant stated that he could not count anymore. Defendant stated that he had had a stroke and that his wife had left him.

¶ 9      The video further shows that, when Scott expressed to defendant that he felt that defendant was impaired by alcohol and unfit to drive, defendant asked to walk home. Scott then asked defendant to take a breath test. Defendant replied that he would rather just walk home. Scott again asked defendant to take a breath test. Defendant stated that he was "in stroke mode." When Scott again asked if defendant needed to go to the hospital, defendant said no. Scott thereafter arrested defendant for DUI.

¶ 10      The trial court granted defendant's motion to quash his arrest and suppress evidence, finding that Scott did not have reasonable suspicion to make an investigatory stop of defendant and that Scott lacked probable cause to arrest defendant for DUI.

¶ 11      The trial court's primary basis for granting the motion was the lack of reasonable suspicion to justify the stop. With respect to the tip, the trial court stated that it did not know who the tipster was or his or her basis of knowledge, referring to the tipster as "anonymous." The court also noted that the tipster did not provide a sufficient description of the driver of the vehicle, stating: "They don't give a description of the person who drove the car, male, female, white, black, or anything like that, so for all we know, we don't know if it was the defendant who potentially almost drove in the Casey's store." With regard to the headlight issue, the court found that the video did not corroborate Scott's testimony that the headlights were off for up to four seconds, noting that, "[a]t best," the lights were off for only two seconds. Moreover, the court found that the headlights being turned off for two seconds was not a violation of the traffic code, as it did not occur on a public highway.

¶ 12      As an alternative basis for granting the motion, the trial court found that the DUI arrest was not supported by probable cause. The court noted that the video showed that defendant was able to properly turn from private property onto Plank Road and drive down Plank Road to Main Street, where defendant again made a proper turn. The court acknowledged defendant's admission to drinking three beers a number of hours before and Scott's testimony that defendant's eyes were bloodshot. The court disagreed with Scott's characterization of defendant's speech as slurred, finding Scott's testimony on the issue not credible. The court noted that, although the video was difficult to hear at points, the court had no difficulty understanding what defendant was saying. The court also observed that the video showed that defendant was able to lock his car, walk to the squad car, remove his glasses, and put his glasses back on without difficulty. The court also found that, although defendant dropped his keys, he was able to pick up the keys with no problems, did not sway during the HGN test, and performed the alphabet test without difficulty.

¶ 13      The State filed a timely notice of appeal and certificate of impairment.

¶ 14                                    II. ANALYSIS

¶ 15      The State argues that the trial court erred in granting defendant's motion to quash his arrest and suppress evidence. According to the State, Scott's investigatory stop of defendant's

vehicle was supported by a reasonable suspicion that Scott was committing DUI, and Scott's subsequent arrest of defendant for DUI was supported by probable cause.

¶ 16 We apply a two-part standard of review when reviewing the trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Almond*, 2015 IL 113817, ¶ 55. We afford great deference to the trial court's findings of fact, and we reverse those findings only if they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the trial court's ultimate ruling as to whether suppression is warranted. *Id.*

¶ 17 We first consider whether the trial court erred in finding that Scott did not have a reasonable suspicion to stop defendant's car. A vehicle stop is analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *People v. Henderson*, 2013 IL 114040, ¶ 25. "*Terry* authorizes a police officer to effect a limited investigatory stop where there exists a reasonable suspicion, based upon specific and articulable facts, that the person detained has committed or is about to commit a crime." *People v. Smulik*, 2012 IL App (2d) 110110, ¶ 5. In evaluating whether a reasonable suspicion existed, a reviewing court should objectively consider whether information known to the officer at the time of the stop would warrant a person of reasonable caution to believe that a stop was necessary to investigate the possibility of criminal activity. *People v. Shafer*, 372 Ill. App. 3d 1044, 1048-49 (2007). We note that reasonable suspicion justifying a *Terry* stop is a less exacting standard than probable cause to make an arrest. *Id.* at 1048.

¶ 18 A *Terry* stop can be based on information received from an informant (*People v. Linley*, 388 Ill. App. 3d 747, 750 (2009)), under certain circumstances:

> "[T]he informant's tip must bear some indicia of reliability in order to justify the stop. [Citation.] [A] reviewing court should consider the informant's veracity, reliability, and basis of knowledge. [Citation.] Whether a tip is sufficient to support a stop is not determined according to any rigid test but rather depends on the totality of the circumstances." (Internal quotation marks omitted.) *Smulik*, 2012 IL App (2d) 110110, ¶ 7.

One factor that affects the reliability of a tip is whether the tip is from an anonymous or identified party. *Shafer*, 372 Ill. App. 3d at 1050-52. When determining the reliability of an anonymous tip, courts have considered the following factors: (1) whether there was a " 'sufficient quantity of information' " to allow the officer to be certain that the vehicle stopped was the one identified by the tipster; (2) the time interval between when the police located the suspect vehicle and when the information was first relayed to the police; (3) whether the tip was " 'based upon contemporaneous eyewitness observations' "; and (4) whether the tip was " 'sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed an ongoing motor vehicle offense.' " (Internal quotation marks omitted.) *Id.* at 1050 (quoting *State v. Sousa*, 855 A.2d 1284, 1290 (N.H. 2004)). A call to a police emergency line does not constitute an " 'anonymous' tip" and should not be viewed "with the skepticism applied to tips provided by confidential informants," because the caller places his or her anonymity at risk. *Id.* at 1054. Furthermore, when the tip concerns a possible drunk driver, less corroboration of the tip is required because "[a]n intoxicated person behind the wheel of a car presents an imminent danger to the public that is difficult to thwart by means other than a *Terry* stop." *Id.* at 1052.

¶ 19 We first consider whether the tip from the clerk at Casey's was sufficiently reliable to justify the stop of defendant's vehicle. We determine that it was. First, we note that the trial

court's findings that the tipster was "anonymous" and that the tip did not sufficiently identify defendant were against the manifest weight of the evidence. With regard to anonymity, the testimony clearly established that the clerk telephoned the police, identified the Casey's at which he or she was employed, and later spoke directly with a police sergeant. As the clerk was readily identifiable, the tip was not anonymous. See *id.* at 1050-52. With regard to the content of the tip, Scott's testimony established that the tipster specifically described the driver of the vehicle as a white male and, in addition, provided the make and color of the vehicle.

¶ 20    Given the fact that the tip was not anonymous, it bears an initial degree of reliability. In addition, other factors that have been used to evaluate the reliability of anonymous tips further bolster a finding of reliability here. See *id.* at 1050. The clerk specified that a white male, driving a white Scion, hit the curb at Casey's and almost hit the building; that the driver was in the store; and that the driver was possibly drunk. Scott arrived at Casey's shortly after receiving the call from dispatch. Scott observed a white Scion and fairly soon thereafter observed a white male enter the vehicle. Thus, it is clear that the tip was reliable in that it was based on contemporaneous events and provided enough information to allow Scott, who arrived within a short time of learning of the tip, to identify defendant as the person referred to by the tipster. In addition, the tip was sufficiently detailed to permit a reasonable inference that defendant was committing DUI, given the clerk's description of defendant's driving as well as the clerk's close proximity to defendant and ability to observe defendant in Casey's. See *id.* at 1054-55 (although record was silent as to what the defendant did to cause the tipster to call the police, the close proximity during a hand-to-hand exchange between the tipster and the defendant at a drive-through window supported reliability of the tipster's assessment that the defendant was intoxicated).

¶ 21    In addition to the reliability of the tip, Scott observed defendant turn his headlights off and then back on again as defendant made his way from Casey's to the public highway. We disagree with the State that this factor, standing alone, was sufficient to support the investigatory stop, as defendant was not traveling on the public highway at the time and thus did not violate sections 12-101(a) or 12-201(b) of the Illinois Vehicle Code (Code) (see 625 ILCS 5/12-101(a), 12-201(b) (West 2016)). However, it was certainly a factor for Scott to consider, along with the other information he had before him.

¶ 22    Defendant argues that our decision in *Village of Mundelein v. Minx*, 352 Ill. App. 3d 216 (2004), supports the trial court's order. We disagree. In *Minx*, the caller simply reported that the defendant was " 'driving recklessly.' " *Id.* at 222. We said that, "without indicating what observations led him to this conclusion," this information standing alone did not justify the investigatory stop. *Id.* In the instant case, the caller provided enough detail to permit a reasonable inference that defendant was possibly intoxicated. The clerk saw defendant hit the curb, go over it, and nearly strike the store building. The clerk then had the opportunity to observe defendant "in the building" before calling the police.

¶ 23    Finally, we note that, for the purpose of determining the existence of reasonable suspicion, "[t]he facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001). Here, at the time of the stop, Scott was acting on a reliable tip that defendant had driven over a curb and almost hit a building and was possibly drunk. After locating defendant, Scott observed him blinking his headlights for no apparent reason.

¶ 24 Based on the totality of the circumstances, we find that the investigatory stop of defendant's vehicle was supported by a reasonable suspicion that defendant was committing an offense, and thus the trial court erred in granting defendant's motion to quash his arrest and suppress evidence on this basis.

¶ 25 We next consider whether the trial court erred in finding that Scott lacked probable cause to arrest defendant for DUI. Probable cause to arrest exists when the totality of the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). Probable cause concerns probabilities and not technicalities. *Id.* at 564. That is, probable cause is based on the factual and practical considerations of everyday life upon which reasonable, prudent people, not legal technicians, act. *Id.* Probable cause is more than a mere suspicion (*People v. Wingren*, 167 Ill. App. 3d 313, 320 (1988)) but less than proof beyond a reasonable doubt (*Wear*, 229 Ill. 2d at 564).

¶ 26 The elements of DUI under section 11-501(a)(2) of the Code (625 ILCS 5/11-501(a)(2) (West 2016)) are: (1) the defendant was driving or in actual physical control of the vehicle and (2) the defendant was under the influence of alcohol. Here, only the second element is at issue.

¶ 27 There are several pieces of evidence indicating that defendant was under the influence of alcohol. When considered in their totality, they provided Scott with probable cause to arrest defendant for DUI. Scott testified that, when he approached defendant's vehicle, the window was down and he smelled the odor of alcohol on defendant's breath. In addition, defendant admitting to drinking three beers about six or seven hours earlier. See, *e.g.*, *People v. McKown*, 236 Ill. 2d 278, 302 (2010) ("[A]ny evidence of alcohol consumption is relevant to the question of impairment."). Scott observed that defendant's "eyes were glassy and bloodshot" and that his speech was "thick-tongued and slurred." See *Wingren*, 167 Ill. App. 3d at 320 ("Probable cause to arrest a motorist for DUI has been commonly established by the testimony of the arresting officer, in spite of the defendant's contradictory testimony, that the motorist had about him or her the odor or strong odor of alcohol, had slurred speech or had red and glassy eyes."). Although the trial court found that defendant was "understandable," the video supports Scott's testimony concerning defendant's speech. Scott also testified that defendant had a hard time getting his driver's license out of his wallet and "fumbled his wallet a few times," initially giving Scott a credit card rather than his insurance card.

¶ 28 When Scott asked defendant to take a breath test, defendant responded that he was "in stroke mode," yet refused Scott's offer to call an ambulance. Moreover, when Scott expressed that he felt that defendant was impaired by alcohol and unfit to drive, defendant asked to walk home. And when Scott again asked defendant to take the breath test, defendant refused. Defendant's refusal to take the breath test and his request to walk home were circumstantial evidence of his consciousness of guilt and further supported probable cause to arrest. See *People v. Weathersby*, 383 Ill. App. 3d 226, 230 (2008) (refusal to take breath test was circumstantial evidence of the defendant's consciousness of guilt).

¶ 29 In sum, defendant's fumbling of his driver's license and producing a credit card rather than an insurance card, defendant's glassy and bloodshot eyes, defendant's slurred speech, the odor of alcohol on defendant's breath, defendant's admission to drinking, and defendant's refusal to take a breath test would cause a reasonably cautious person to believe that defendant was impaired.

¶ 30    Defendant's reliance on *People v. Day*, 2016 IL App (3d) 150852, and *People v. Motzko*, 2017 IL App (3d) 160154, does not warrant a different conclusion. In *Day*, the court found that the defendant's consumption of alcohol and glassy and bloodshot eyes were insufficient, without more, to give rise to probable cause to arrest for DUI. *Day*, 2016 IL App (3d) 150852, ¶ 38. Here, as noted, we have more. Moreover, unlike in *Day*, defendant did not successfully complete any field sobriety tests. In *Day*, the court specifically found that, although the field sobriety tests were improperly administered on a wet, slick surface while it was raining, they gave no indication that the defendant was suffering from any sort of physical impairment. *Id.* ¶ 37.

¶ 31    In *Motzko*, the court affirmed the trial court's grant of the defendant's motion to suppress. *Motzko*, 2017 IL App (3d) 160154, ¶ 26. There, the arresting officer testified that he had arrested the defendant based on the odor of alcohol on the defendant's breath, the defendant's glassy and bloodshot eyes, the defendant's admission to drinking, the fact that the defendant was in an accident, and the defendant's performance on the HGN test. *Id.* ¶¶ 22-25. The officer testified that the defendant's performance on the HGN test caused him to believe that the defendant was impaired. *Id.* ¶ 25. The trial court found the officer to lack credibility on the issue of impairment, after concluding that the officer was not properly trained to understand the results of HGN testing. *Id.*

¶ 32    Defendant argues that here, as in *Motzko*, the court had similar credibility concerns. We find the present case distinguishable, as the trial court's concerns are not supported by the evidence. First, the court questioned Scott's credibility on the issue of how long defendant's headlights were off. Scott estimated that the headlights were off for one to four seconds. The trial court found that the lights were off for "[a]t best" two seconds. Our view of the video confirms the trial court's finding that the lights were off for about two seconds. But we fail to see how this renders Scott's testimony of one to four seconds incredible. Second, the trial court found Scott's testimony regarding defendant's speech incredible as well. Scott described defendant's speech as "thick-tongued and slurred." Having viewed the video, we cannot say that Scott's description of defendant's speech was inaccurate. Thus, we find that the trial court's credibility concerns do not support affirmance of the court's ruling.

¶ 33    Accordingly, we hold that Scott had probable cause to arrest defendant for DUI.

¶ 34                                    III. CONCLUSION

¶ 35    Based on the foregoing, we reverse the judgment of the circuit court of De Kalb County and remand the cause.

¶ 36    Reversed and remanded.