2024 IL App (4th) 231185

NO. 4-23-1185

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McDonough County |
| TYEASHA JOHNSON, | ) | No. 22DT62 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Nigel D. Graham, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Harris and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1    In September 2022, the State charged defendant, Tyeasha Johnson, with driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2022)) and failure to signal (*id.* § 11-804). In March 2023, defendant filed a motion to suppress evidence, claiming that the traffic stop that resulted in her arrest was unlawful because it was not supported by reasonable suspicion. In June 2023, following a hearing, the trial court denied defendant's motion.

¶ 2    In October 2023, the trial court found defendant guilty of DUI after a stipulated bench trial. (The failure to signal citation was subsequently dismissed.)

¶ 3    Defendant appeals, arguing that the trial court erred by denying her motion to suppress evidence because the officer lacked a reasonable suspicion to stop her vehicle. Specifically, defendant asserts that (1) the citizen's tip that defendant was driving while

intoxicated was not sufficiently detailed to be reliable and (2) the officer's own observations of defendant's driving did not give rise to a reasonable suspicion that defendant had committed a traffic violation.

¶ 4     We disagree and affirm.

¶ 5                              I. BACKGROUND

¶ 6                     A. The Charges and Motion To Suppress

¶ 7     In September 2022, the State charged defendant with one count of DUI (*id.* § 11-501(a)(2)) and one count of failing to signal (*id.* § 11-804).

¶ 8     In March 2023, defendant filed a motion to suppress evidence, claiming that the traffic stop was unlawful because (1) the 911 call reporting her as a drunk driver lacked sufficient detail to be reliable and (2) the officer who initiated the stop did not have a reasonable, articulable suspicion that a traffic violation had occurred.

¶ 9     In June 2023, the trial court conducted a hearing on defendant's motion to suppress, at which the arresting officer and defendant testified.

¶ 10                            1. *Officer Renata Sturlic*

¶ 11    Renata Sturlic testified that she was a police officer employed by the Macomb Police Department at the time of the traffic stop. (We note that both defendant and the State called Sturlic to testify during their cases-in-chief. The following is a summary of her entire testimony.) Sturlic stated that she received a dispatch of an intoxicated driver with children in the car in the area of the River Run apartment complex (River Run). The dispatch identified the car as a gray SUV and included a possible license plate number. Based on this information, Sturlic drove toward River Run.

¶ 12    On the way, Sturlic saw a vehicle that she believed was the subject of the dispatch

and began to follow it. However, she soon learned it was the wrong vehicle because (1) the license plate did not match the plate number in the dispatch and (2) she received a second dispatch stating that the subject vehicle was still at River Run but was now leaving. Sturlic hurried to River Run, activating her overhead lights at times to get to River Run quickly, given the report of juvenile passengers that she believed may be in danger.

¶ 13       Shortly thereafter, Sturlic believed she saw the vehicle that was the subject of the dispatch traveling in the opposite lane of traffic, and Sturlic completed a U-turn to get behind it. Sturlic's overhead lights were still activated when she initiated the U-turn, but she turned them off when she completed the turn. After catching up to the vehicle, which had stopped at an intersection for a short time, Sturlic was able to confirm it matched the vehicle description and plate number from the dispatch.

¶ 14       Sturlic testified that instead of immediately stopping the vehicle, she decided "to continue to follow it to make sure that it was the vehicle I was looking for and to see if there were any reasons to stop the vehicle." Sturlic followed the vehicle without her overhead lights activated for approximately two minutes when, without any signal from Sturlic, the car stopped in the roadway (which, we note from the squad car video, discussed later (*infra* ¶¶ 18-23), was an unmarked road in a rural area). Sturlic stopped her own squad car behind the car "to see what was going to happen." Sturlic testified that she "thought a vehicle stopping in the middle of the roadway for no apparent reason was odd." She explained that there were no obstructions in the roadway, no one exited the car, and the driver did not turn on the car's flashing lights. The vehicle sat still in the roadway for "approximately a minute," then resumed driving. At the intersection of Pearl and Pierce Streets, Sturlic observed a traffic violation—namely, "[t]he vehicle failed to stop prior to the white line as indicated. Instead, it stopped out into the intersection."

¶ 15    Also on Pearl Street, Sturlic saw the car move abruptly into the left lane. When asked whether Sturlic had any idea why the car changed lanes abruptly, she answered that she "saw some gravel after it had moved." The gravel appeared to be from some road construction, but Sturlic traveled over it without any problem.

¶ 16    The car turned on to East Calhoun Street, and Sturlic then saw the car make a second abrupt movement to the left without any obstruction in the roadway. The car then pulled into a driveway, at which time Sturlic activated her overhead lights because she believed she had a reasonable suspicion or probable cause to initiate a traffic stop, based upon the information in the dispatch and the driving she observed. When the State asked Sturlic to describe the basis for her determination, Sturlic testified as follows:

"A. It was the totality of the circumstances, the description of the vehicle, where it was coming from, the traffic violations.

Q. The violation—or the traffic violations, specifically, the failure to stop behind the stop sign?

A. Mm-hmm.

Q. And the—on that one, did you feel that you had reason to pull the vehicle over solely based on that?

A. Yes.

Q. Okay. Now, in reference to the initial call, you were told that there was a possible intoxicated driver. Was there anything in the manner that the vehicle drove after you had that information that *** caused you to believe that it could potentially be an intoxicated driver?

A. Yes. Just some abrupt movements and abrupt stops I thought were very

- 4 -

out of the ordinary."

¶ 17    Sturlic's traffic stop and resulting interaction with defendant culminated in defendant's arrest.

¶ 18                    2. *The Squad Car Video*

¶ 19    Defendant offered, and the trial court admitted, a copy of Sturlic's squad car video into evidence. The video depicted Sturlic encountering defendant's vehicle driving in the opposite direction on a two-lane road. Sturlic performed a three-point turn after defendant drove past and deactivated her emergency lights as she completed the turn.

¶ 20    Sturlic caught up to defendant, who was sitting stationary at a stop intersection several feet behind the white stop line with her right turn signal activated. Defendant remained there for approximately 35 seconds before she drove forward to the white stop line, activated her brake lights without coming to a full stop, and completed a rolling right-hand turn.

¶ 21    Sturlic continued to follow defendant, who made a left-hand turn through a stoplight intersection and, shortly thereafter, a right-hand turn onto a smaller road with no lane markings. Once on this unmarked road, defendant pulled slightly to the right and came to a complete stop, with the passenger-side wheels touching the edge of the pavement and the grass. Defendant did not signal before stopping or pulling slightly to the right. Defendant remained stopped for approximately 40 seconds before resuming driving. She did not signal before pulling back into the roadway.

¶ 22    Sturlic continued to follow defendant on the unmarked road, which entered a residential area. Defendant, without any signal, abruptly moved from the right side of the road to the left side, avoiding an area of packed gravel in the right lane before pulling back into the right lane, again without signaling. Sturlic continued to drive straight, and her squad car drove over the

packed gravel without any discernible effect on her squad car. Shortly thereafter, defendant approached a stop sign. Sturlic's squad video, recording from directly behind defendant's vehicle, does not definitely depict whether defendant stopped entirely in front of the line, on the line, or slightly beyond the line.

¶ 23 Defendant drove a short distance and made a right-hand turn onto Calhoun Street. Defendant drove on the right side of the unmarked street, then moved into the left-hand side of the street without signaling. Defendant continued in the left lane for a short distance before signaling a left-hand turn into a driveway. Sturlic activated her overhead lights to initiate a traffic stop. The car turned into the driveway and came to a stop.

¶ 24 3. *Defendant*

¶ 25 Defendant testified that on the evening she was stopped, she was leaving the River Run apartment complex. Defense counsel asked her whether she "stopped there at the intersection," and defendant answered affirmatively, explaining that she stopped "[b]ecause the cop got behind me and her lights were bright, and we didn't understand why she got behind us, so I just sat there thinking she was going to pull me over." According to defendant, when Sturlic "first came in," she had her lights activated, but she turned them off when she got behind defendant. Defendant stopped her vehicle, but she eventually concluded that Sturlic was not pulling her over and resumed driving.

¶ 26 Defendant testified that when she arrived at Pearl Street, she stopped again because "[Sturlic] was so close on me, and her lights were still bright, and I didn't get why she was still following me all the way from River Run and still going." Defendant stated that she stopped because she thought Sturlic was attempting to pull her over, but defendant again resumed driving when Sturlic did not initiate a traffic stop.

¶ 27 Defendant testified that she believed she made complete stops at the stop signs and was not past the line as Sturlic described.

¶ 28 Defendant then testified that she lived on Calhoun Street, which did not have lane markers. She stated that she moved to the left to avoid hitting gravel on the road.

¶ 29 On cross-examination, defendant testified that she was not drinking that night but conceded that she took a breath test that measured her blood alcohol content as 0.176. Defendant explained that when she arrived in her driveway and Sturlic finally activated her overhead lights, she became "irritated," so she drank "five bottles of shooters" that were in the car. Defendant emphasized that she "was irritated because [Sturlic] had plenty of time to pull me over and didn't and waited until I got home." Defendant stated that it does not take her long to get drunk. (We note that the State recalled Sturlic, who testified that she approached defendant's vehicle "[j]ust a few seconds" after making the stop.)

¶ 30 4. *The Trial Court's Ruling*

¶ 31 After listening to the arguments of the parties, the trial court took the matter under advisement and continued the case.

¶ 32 When the parties reconvened the following week, the trial court issued an oral ruling denying defendant's motion to suppress. The court first found that two bases existed for Sturlic to initiate the traffic stop—namely, (1) the "citizen informant" and (2) the officer's observations.

¶ 33 Regarding the "citizen informant," the trial court found that, although the court "was not given a lot of great deal of information about the tip itself," the logical conclusions to be drawn were that (1) the information came from a person who had called 911 and identified himself or herself and (2) the tip was made contemporaneously with the informant's observations.

¶ 34    The trial court observed that under the precedent of the Second District Appellate Court—namely, *Village of Mundelein v. Minx*, 352 Ill. App. 3d 216, 815 N.E.2d 965 (2004)—Sturlic's traffic stop would not have been justified given the limited amount of information in the dispatch. However, after redistricting, the court observed that it was obligated to follow precedent of the Fourth District Appellate Court, which declined to follow *Minx* and instead set forth its own standard, reflected in three separate opinions—namely, *People v. Shafer*, 372 Ill. App. 3d 1044, 868 N.E.2d 359 (2007); *People v. Ewing*, 377 Ill. App. 3d 585, 880 N.E.2d 587 (2007); and *People v. Hansen*, 2012 IL App (4th) 110603, 968 N.E.2d 164. The court noted, "In all of those cases, the Fourth District has held that informant's tips regarding possible incidents of drunk driving require less rigorous corroboration than tips presenting less imminent danger to the public."

¶ 35    The trial court then discussed *Shafer* and *Ewing* in detail, identifying the four *Shafer* factors for determining whether a traffic stop based on an anonymous informant's tip of possible drunk driving is justified: (1) whether there is a sufficient quantity of information so the officer can be certain the vehicle stopped is the one the tipster identified, (2) the length of the time interval between the officer's receiving the tip and the officer's locating the suspect vehicle, (3) whether the tip is based on contemporaneous eyewitness observations, and (4) whether the tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed an ongoing motor vehicle offense. *Shafer*, 372 Ill. App. 3d at 1050.

¶ 36    The trial court found all four *Shafer* factors were satisfied in the present case and, accordingly, Sturlic had a reasonable suspicion to stop defendant's vehicle.

¶ 37    The trial court next found that Sturlic's observations of defendant's driving during the six minutes that Sturlic followed her did not dispel the reasonable suspicion created by the informant's tip. Although the court found that the "vast majority of [d]efendant's driving was

- 8 -

appropriate," it also found that defendant's "abrupt stop" on the side of the road in a "remote stretch of dark road" instead of in a parking lot or lighted area "was strange and could point to the behavior of one who was under the influence or at least not exercising normal decision making."

¶ 38    The trial court also found that defendant's "swerving around the construction site" was not unreasonable and her stopping "a hair" beyond the stop line did not, on its own, justify a stop. The court concluded, however, that defendant's driving, as a whole, did not serve to dispel the reasonable suspicion that arose from the informant's tip.

¶ 39    In July 2023, defendant filed a motion to reconsider, which in August 2023, following a hearing, the trial court denied.

¶ 40    B. The Bench Trial and Sentence

¶ 41    In October 2023, defendant waived her right to a jury trial, and the parties agreed to proceed by way of a stipulated bench trial. The State made an oral recitation of the evidence it would present at trial, and defendant entered a short, written stipulation.

¶ 42    In summary, in addition to the evidence presented at the suppression hearing, the State would present further evidence that, after initiating the traffic stop and making contact with defendant, Sturlic observed signs of impairment, including glassy eyes, the odor of alcohol, and slurred speech. Defendant was drinking water out of a water bottle at a fast rate and claimed the window would not roll down, although it was already partially down. Defendant showed further signs of impairment when she performed standardized field sobriety tests. A breath test was administered that measured defendant's blood alcohol content to be 0.176. Additionally, two children were in the vehicle, ages 1 and 11.

¶ 43    In October 2023, the trial court sentenced defendant to two years of court supervision. The failure to signal citation was dismissed.

¶ 44    This appeal followed.

¶ 45                         II. ANALYSIS

¶ 46    Defendant appeals, arguing that the trial court erred by denying her motion to suppress evidence because the officer lacked a reasonable suspicion to stop her vehicle. Specifically, defendant asserts that (1) the citizen tip that she was driving while intoxicated was not sufficiently detailed to be reliable and (2) the officer's own observations of defendant's driving did not give rise to a reasonable suspicion that defendant had committed a traffic violation.

¶ 47    We disagree and affirm.

¶ 48                      A. The Applicable Law

¶ 49                      1. *Standard of Review*

¶ 50    "When reviewing a ruling on a motion to suppress, a bifurcated standard of review applies." *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 49, 138 N.E.3d 46. "[T]he trial court's findings of fact are entitled to great deference, and we will reverse those findings only if they are against the manifest weight of the evidence." *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8, 98 N.E.3d 420. "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944. However, the trial court's legal determination of whether suppression is warranted under those facts is reviewed *de novo*. *People v. Carter*, 2021 IL 125954, ¶ 21, 190 N.E.3d 224. "Consequently, a reviewing court remains free to engage in its own assessment of the facts in relation to the issues presented." *Id.*

¶ 51                         2. Terry *Stops*

¶ 52    The United States Constitution and the Illinois Constitution protect individuals

from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "[T]he touchstone of the fourth amendment is reasonableness, which is measured objectively by examining the totality of the circumstances surrounding a police officer's encounter with a citizen." *People v. Lake*, 2015 IL App (4th) 130072, ¶ 28, 28 N.E.3d 1036.

¶ 53    The temporary detention of an individual during a vehicle stop is a seizure within the meaning of the fourth amendment. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Such seizures, commonly referred to as *Terry* stops, are analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Timmsen*, 2016 IL 118181, ¶ 9. "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person when the officer reasonably believes that the person has committed, or is about to commit, a crime." *Id.*

¶ 54    A *Terry* stop "must be justified at its inception, and the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 40, 996 N.E.2d 575. "In evaluating whether reasonable suspicion exists, a court should objectively consider whether the information known to the officer at the time of the stop would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity." (Internal quotation marks omitted.) *Shafer*, 372 Ill. App. 3d at 1048-49.

¶ 55    In the context of traffic stops, "[r]easonable suspicion exists where an officer possesses specific, articulable facts that, when combined with rational inferences derived from those facts, give rise to a belief the driver is committing a traffic violation." *People v. Mott*, 389 Ill. App. 3d 539, 544, 906 N.E.2d 159, 164 (2009).

¶ 56    In determining whether the officer acted reasonably, a reviewing court applies an

objective standard and considers whether the facts available to the officer at the time of the stop warrant a person of reasonable caution to believe that the action taken was appropriate. *People v. Carter*, 2021 IL 125954, ¶ 24, 190 N.E.3d 224. "Though a reasonable, articulable suspicion is a less demanding standard than probable cause, an officer's suspicion must amount to more than an unparticularized suspicion or hunch of criminal activity." *Id.* When examining the validity of the stop, we consider "the totality of the circumstances—the whole picture." (Internal quotation marks omitted.) *Id.*

¶ 57                                a. *Terry* Stops Based on Informants' Tips

¶ 58           A police officer may initiate a *Terry* stop based on information received from a third party if the information is reliable and allows the officer to reasonably infer that a person was involved in criminal activity. *Shafer*, 372 Ill. App. 3d at 1049; *Ewing*, 377 Ill. App. 3d at 595; *Hansen*, 2012 IL App (4th) 110603, ¶ 20.

¶ 59           "One factor that affects the reliability of a tip is whether that tip is anonymous or nonanonymous." *Hansen*, 2012 IL App (4th) 110603, ¶ 20. Calls made to a police emergency number, such as 911, are not anonymous because the police have enough information to identify the caller, even if he or she does not give his or her name. *Ewing*, 377 Ill. App. 3d at 595 (citing *Shafer*, 372 Ill. App. 3d at 1050).

¶ 60           Although a 911 call is not *per se* reliable, a caller's use of the 911 emergency system is an "indicator of veracity" and "one of the relevant circumstances that can justify an officer's reliance on the information reported in the call." *Carter*, 2021 IL 125954, ¶ 26.

¶ 61           Although anonymous tips are generally considered less reliable than nonanonymous tips, this court has identified four factors, viewed in light of the totality of the circumstances, that are important to determining whether an anonymous tip gives rise to

reasonable suspicion. *Shafer*, 372 Ill. App. 3d at 1050. Those factors include (1) "whether there is a sufficient quantity of information such as the vehicle's make, model, license plate number, location and bearing *** so that the officer may be certain that the vehicle stopped is the one the tipster identified," (2) "the time interval between the police receiving the tip and the police locating the suspect vehicle," (3) "whether the tip is based upon contemporaneous eyewitness observations," and (4) "whether the tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed an ongoing motor vehicle offense." (Internal quotation marks omitted.) *Id.*

¶ 62         Moreover, less rigorous corroboration of tips is needed when the tip concerns a suspected drunk driver because intoxicated drivers pose a significant risk to themselves and the public. *Id.* at 1052-53. "An intoxicated person behind the wheel of a car presents an imminent danger to the public that is difficult to thwart by means other than a *Terry* stop." *Id.* at 1052.

¶ 63             b. This Court's Prior Decisions Regarding *Terry* Stops Based on

Informants' Tips Reporting Suspected Drunk Driving

¶ 64                                 i. *Shafer*

¶ 65         In *Shafer*, the defendant filed a petition to rescind the statutory summary suspension of his driver's license, arguing that the traffic stop leading to his arrest for DUI was not supported by reasonable suspicion. *Id.* at 1046. At the hearing on the petition, the arresting officer testified that he had received information through his dispatcher that an employee at the local Wendy's restaurant had called regarding a person who " 'was causing a disturbance and was intoxicated' " while ordering food at the drive-thru. *Id.* at 1047. The officer had no further information about the suspect or the caller. *Id.* The officer arrived "quickly" at the restaurant, saw a car leaving the parking lot, activated his overhead lights, and pulled the car over. *Id.* Prior to pulling the car over,

the officer did not observe any traffic violations. *Id.* The trial court denied the defendant's petition to rescind. *Id.* at 1048.

¶ 66 This court affirmed the trial court's denial of the defendant's petition, rejecting his argument that the tip was unreliable. *Id.* at 1054-55. This court first noted that the call should not be viewed as an anonymous tip because the police knew that it (1) came from an employee at the only Wendy's in town and (2) was made to a police emergency number. *Id.* at 1054. Nonetheless, we examined the four factors for determining whether an anonymous tip was sufficiently reliable to justify a traffic stop and concluded that the tip was reliable. *Id.* at 1054-55.

¶ 67 Specifically, (1) "the timing of the tip provided [the officer] with sufficient basis for believing that the car he was stopping shortly after it pulled out of the Wendy's parking lot was the one the tipster had called about," (2) "the time interval between [the officer's] receiving the tip and his locating the suspect car could hardly be smaller," (3) "the tip clearly was based upon contemporaneous eyewitness observations by the Wendy's employee at the drive-thru window," and (4) "the tip was sufficiently detailed to permit a reasonable inference that the tipster had actually witnessed what he or she described—namely, that [the] defendant had created a disturbance and was intoxicated at the drive-thru window." *Id.* at 1054.

¶ 68                                    ii. *Ewing*

¶ 69 In *Ewing*, the defendant, who was charged with DUI, filed a motion to suppress and a petition to rescind. *Ewing*, 377 Ill. App. 3d at 586. At the hearing on defendant's motion, the arresting officer testified that he overheard a dispatch from the 911 center that "an employee of [Crestline Veterinary Clinic] believed that the defendant was intoxicated and he left in a green pickup truck with another white male heading eastbound." (Internal quotation marks omitted.) *Id.* at 586-87. A recording of the call was played, establishing that the caller, who identified herself

as "Melissa from Crestline," said "they" had dropped off a dog to be put down. She identified the defendant by name and said "they" were drunk and did not need to be driving. *Id.* at 588-89. The officer located the suspect vehicle and pulled it over without observing any traffic violations. *Id.* at 588.

¶ 70          The trial court granted defendant's motion and petition, and this court reversed the trial court's order, holding that the phone tip "provided [the officer] with the requisite quantum of suspicion to justify the *Terry* stop of [the] defendant's car." (Internal quotation marks omitted.) *Id.* at 593. We first noted that the call was not anonymous because it was made to a police emergency number, and we then concluded all four of the *Shafer* factors supported the conclusion that the tip was reliable and gave the officers a reasonable suspicion to justify the stop. *Id.* at 595-97.

¶ 71                              iii. *Hansen*

¶ 72          In *Hansen*, a juvenile called 911 to report a truck doing " 'donuts' " in the road and identified the truck as a single-cab, black GMC truck with a black dog in the back and a sticker on the rear window that read " 'All Types Landscaping.' " *Hansen*, 2012 IL App (4th) 110603, ¶ 6. The juvenile also reported that there were two men in the front seat and a child in the back. *Id.* The juvenile's mother then got on the phone and reported that the black truck was " 'hot rodding' " up and down the street. *Id.* ¶ 7. She confirmed the phrase " 'All Types Landscaping' " was written on the window and added that there was a black dog in the cab and two men in the truck, although she doubted a child was in the back seat. *Id.* She said she " 'didn't know if they had been drinking.' " *Id.* A short time after that call, the mother placed a second call to 911, reporting that the truck had left the area and was heading toward Jerseyville on Route 16. *Id.* ¶ 8.

¶ 73          Shortly thereafter, a police officer observed a black GMC truck with a black dog in the back and the phrase " 'All Types Landscaping' " written on the window on Route 16. *Id.* ¶ 9.

- 15 -

The truck did not have a back seat, and the defendant was the sole occupant. *Id.* The officer initiated a traffic stop, which culminated in the defendant's arrest for DUI. *Id.*

¶ 74　　　　　The trial court granted the defendant's petition to rescind and motion to suppress (*id.* ¶¶ 10-11), and this court reversed (*id.* ¶ 2). We first observed that the tip was not anonymous because it was a 911 call and was therefore more reliable than other calls. *Id.* ¶ 41. We then determined that "[t]he lack of anonymity, combined with the four *Shafer* factors, support[ed] the conclusion that reasonable suspicion existed." *Id.* Specifically, the quantity and detail of the information from the calls was such that the officer could be reasonably certain that the truck he was stopping was the one the callers described. *Id.* ¶ 43. We explained that, despite the discrepancy between the report of two men in the truck and the officer finding only the defendant in the truck, it was possible that defendant had another passenger whom he had dropped off before heading toward Jerseyville. *Id.* ¶¶45-46. Moreover, the officer stopped the defendant only six minutes after the first 911 call was placed. *Id.* ¶ 48. And the tip was clearly based on contemporaneous eyewitness observations of ongoing traffic violations because the callers described that they were seeing the truck speeding and "doing 'donuts.' " *Id.* ¶¶ 51-53.

¶ 75　　　　　　　　　　　B. The *Terry* Stop in This Case

¶ 76　　　　　Defendant argues that neither (1) the third-party tip nor (2) Sturlic's own observations of defendant's driving justified the traffic stop in this case.

¶ 77　　　　　The State responds that (1) the third-party tip was sufficiently reliable to justify the traffic stop and (2) even if the tip alone was insufficient, the tip plus Sturlic's observations gave rise to reasonable suspicion. We agree with the State that the traffic stop in this case was supported by reasonable suspicion.

¶ 78　　　　　　　　　　　1. *The Third-Party Tip*

¶ 79       Defendant first argues that the trial court erred by finding that the tip alone provided a reasonable suspicion sufficient to justify the stop. In making this argument, defendant concedes in his brief that the tip (1) "may be given more weight" because "the informant called a police emergency line" and (2) requires "less rigorous corroboration" because it "alleged a possibly intoxicated driver." Defendant also concedes that the first and second *Shafer* factors were satisfied—namely, (1) the tip provided sufficient detail such that the officer could be certain the stopped vehicle was the one the tipster identified and (2) the time interval between the officer receiving the tip and stopping the suspect vehicle was short.

¶ 80       These concessions notwithstanding, defendant argues that the tip did not justify a *Terry* stop because the third and fourth *Shafer* factors were not satisfied. Specifically, defendant contends that the tip (1) was not based on contemporaneous eyewitness observations and (2) lacked sufficient detail to permit the reasonable inference that the tipster actually witnessed the alleged crime.

¶ 81       As an initial matter, we reject the notion that each of the four *Shafer* factors must be satisfied before the tip in this case may be deemed reliable. Indeed, defendant conceded as much at oral argument in this case, stating correctly that the *Shafer* factors are simply relevant factors to be weighed along with all other relevant factors. We also emphasize that the *Shafer* factors were originally developed by the Supreme Court of New Hampshire to assist courts in assessing the reliability of *anonymous* tips, which lack the inherent reliability of a nonanonymous tip (*Shafer*, 372 Ill. App. 3d at 1049-52), such as the one in the present case.

¶ 82       This court has utilized the *Shafer* factors in cases involving nonanonymous tips— such as *Shafer*, *Ewing*, and *Hansen*—because we view them as helpful considerations for a trial court assessing the reliability of a citizen tip and the totality of the circumstances surrounding a

resulting traffic stop, whether the tip was anonymous or nonanonymous. Logically, however, because nonanonymous tips are inherently more reliable than anonymous tips, the *Shafer* factors will necessarily be more important when assessing an anonymous tip than a nonanonymous tip.

¶ 83 The Second District Appellate Court explained the reasoning for the distinction, which applies in the present case and with which we emphatically agree:

> "[I]f a witness has put himself in a position where he would be criminally liable for a false claim if his report proved to be fabricated, little scrutiny of the basis for his knowledge is required. [Citation.] *** [The United States Supreme Court has] considered the anonymity of the tipsters involved to be a primary factor in requiring corroboration of the information provided. However, when information comes from a named witness, it remains the case that a minimum of corroboration or other verification of the reliability of the information is required." *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 851, 793 N.E.2d 996, 1003 (2003).

¶ 84 To accept the notion that all four *Shafer* factors must be present before the citizen tip in this case may be deemed reliable would be to subordinate the nonanonymous nature of the tip and all other factors, such as defendant's odd driving behavior, to the *Shafer* factors. Because the test for reasonable suspicion is the totality of the circumstances, we weigh the individual *Shafer* factors along with all other the other circumstances present in this case.

¶ 85 Defendant has conceded that (1) the call was nonanonymous because it was placed to a police emergency number and (2) the first and second *Shafer* factors are present. Accordingly, we address only the third and fourth *Shafer* factors.

¶ 86 a. Contemporaneous Eyewitness Observation

¶ 87 With regard to the third factor, defendant argues that "the tipster's information was

- 18 -

insufficient to establish that his tip was based on contemporaneous eyewitness observation." We disagree.

¶ 88    The tipster in this case placed two calls to 911. During the first call, the tipster reported an intoxicated driver with children in the car in the area of River Run. Minutes later, the same tipster placed a second call, stating that the vehicle was still at River Run but was now leaving.

¶ 89    These facts are analogous to those addressed by the Illinois Supreme Court in *Carter*, 2021 IL 125954, ¶¶ 4-5, in which the tipster also placed two calls to 911. The first call reported a man with a gun threatening two females at the intersection of 33rd and Wallace Streets in Chicago. *Id.* ¶ 4. The second, placed minutes later, reported that the people " 'were now walking' " in the 3100 block of South Lowe Avenue, which was two blocks to the north of the original location. *Id.* ¶ 5. The *Carter* court concluded that "it was a reasonable inference that the tipster was observing possible criminal activity firsthand, as the tipster was able to give real-time, updated information about the defendant's location." *Id.* ¶ 27.

¶ 90    For the same reasons, we conclude that the evidence of two phone calls—which provided real-time, updated location information of the suspect vehicle—supports the reasonable inference that the tip was based on contemporaneous eyewitness observation. Accordingly, the third *Shafer* factor weighs in favor of reliability.

¶ 91                    b. Ongoing Motor Vehicle Offense

¶ 92    Regarding the fourth factor, defendant argues that the tip "was not sufficiently detailed to permit the reasonable inference that the tipster had actually witnessed an ongoing motor vehicle offense." We disagree.

¶ 93    In *Ewing*, we observed that, both in that case and in *Shafer*, the record was silent as

to "just what [the] defendant[s] did to cause [the tipsters] enough concern to *** call the police." *Ewing*, 377 Ill. App. 3d at 596. Nonetheless, in both cases, we concluded that the tips were reliable, explaining that the callers' positions as employees would allow the reasonable inference that the callers actually witnessed the intoxicated individuals and were able to form reliable opinions about the drunkenness they observed. We did not require that the tipsters provide further details about what they were observing that led them to the conclusion that the defendants were indeed "drunk."

¶ 94    As we noted in *Ewing*, in particular:

"[I]t is reasonable to conclude that a person can determine when another person might be intoxicated. See, *e.g.*, *People v. Workman*, 312 Ill. App. 3d 305, 310, 726 N.E.2d 759, 762-63 (2000) (noting that 'even a layperson is competent to testify regarding a person's intoxication from alcohol, because such observations are within the competence of all adults of normal experience')." *Id.* at 597.

¶ 95    The law does not, and should not, require a tipster to explain why he or she believes a suspected drunk driver is drunk. When a person describes someone as "drunk" or "intoxicated," a reasonable person understands what that descriptor means. That is to say, the description itself conveys that the subject is physically and cognitively impaired by some intoxicating substance and unsafe to operate a vehicle. Additional explanation is not required, particularly in the context of a report of a drunk driver, when the risk to the public is heightened and prompt interdiction is imperative. We emphasize that, in this case, the tipster also reported that two children were in the car, further heightening the danger and Sturlic's need to quickly intervene.

¶ 96    Nonetheless, defendant contends that—unlike *Shafer* and *Ewing*, in which the tipsters were employees of businesses, permitting the inference that the tipster observed the suspect's drunkenness—no similar evidence exists in the present case, prohibiting this court from

making the same inference.

¶ 97 In the present case, Sturlic testified that she received a report of a "possible drunk driver." At the hearing, neither defendant nor the State elicited further testimony about whether the tip contained additional information. The State did not offer a recording of the 911 call into evidence, and Sturlic's squad car video does not contain audio, which may have captured the substance of the dispatch to Sturlic. Accordingly, the evidence before this court is simply that the tipster reported a possible "drunk driver."

¶ 98 While the present case is not factually identical to *Shafer* and *Ewing* in that the record does not establish the precise circumstances under which the tipster observed defendant, the present case is more similar to *Shafer* and *Ewing* than it is dissimilar. In *Shafer* and *Ewing*, this court was able to infer from the tipster's position as a business employee that the tipster had face-to-face contact with the suspect, which lent reliability to the tipster's assessment of the suspect's drunken condition. In the present case, although we cannot infer face-to-face contact between the tipster and defendant, we can infer from the tipster's ultimately corroborated report that two children were in the car that the tipster was sufficiently close enough to defendant to identify the presence of children. We can additionally infer from the tipster's *two* calls to the police emergency number that the tipster observed defendant for a long enough period to lend reliability to the tipster's report.

¶ 99 Nonetheless, even if we accepted that the evidence in the present case was weaker regarding the fourth *Shafer* factor than the evidence in *Shafer* and *Ewing*, we would not be compelled to conclude, as defendant urges, that the tip in this case was unreliable. We disagree with defendant's contention that the caller's assertion that defendant was intoxicated deserves *no* weight because, as we have discussed, we give consideration to the fact that the caller was

- 21 -

concerned enough with what he observed that he placed two calls, under penalty of criminal prosecution if false, to a police emergency line. That is to say, we would not weigh the fourth factor as unreliable but, at worst, as neutral. And because the remaining factors weigh so heavily in favor of reliability, our conclusion would remain that the tip in this case was reliable.

¶ 100                              c. Our Ongoing Rejection of *Minx*

¶ 101          Further, we reiterate our prior rejection of the opinion of the Second District Appellate Court in *Minx*, 352 Ill. App. 3d at 222, which held that a citizen report of a person " 'driving recklessly,' without indicating what observations led him to this conclusion, *e.g.*, whether [the suspect] was speeding, running red lights, weaving between lanes, etc.," did not provide the specificity necessary to justify an investigatory stop. In *Ewing*, we criticized *Minx* as follows:

> "*Minx* is simply wrong. Where a nonanonymous caller reports a reckless, erratic, or drunk driver, the police must be permitted to stop the reported vehicle without having to question the caller about the specific details that led him or her to call so long as the nonanonymous tip has a sufficient indicia of reliability. Reckless and erratic drivers are likely impaired, and such drivers present an imminent danger to other motorists. A police officer should not have to wait to observe such driver commit a traffic violation or obtain specific details supporting the caller's conclusion before stopping the reported vehicle." *Ewing*, 377 Ill. App. 3d at 597.

¶ 102          We explained why the 911 calls in *Shafer* and *Ewing*, albeit lacking the detail that *Minx* would require, "would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity" (internal quotation marks omitted) (*Shafer*, 372 Ill. App. 3d at 1049) when we wrote the following:

"As in *Shafer*, an identified (or identifiable) citizen called a police emergency number from his or her workplace to report that a drunk driver had just driven away. In both cases, the citizens were sufficiently concerned about the condition of these drivers that the citizens overcame any reluctance to call the police, and they apparently did so out of a sense of the danger the drunk drivers posed to the community. For these citizens to call the police is truly extraordinary. When receiving such a call, the police may properly conclude that the circumstances must be pretty serious (at least in the mind of the citizen calling) for that citizen to make such a call, thus adding to the credibility the police may give to the identified (or identifiable) caller." *Ewing*, 377 Ill. App. 3d at 597.

¶ 103                    2. *Sturlic's Observations of Defendant's Driving*

¶ 104       Even if we agreed with defendant that the tip alone in this case did not bear sufficient indicia of reliability to provide Sturlic with reasonable suspicion to justify the traffic stop, the addition of Sturlic's own observations of defendant's aberrant driving certainly provided Sturlic sufficient justification to stop defendant's vehicle.

¶ 105       Sturlic's squad car video depicted defendant (1) sitting stationary several feet in front of a stop sign for 35 seconds with her right-turn signal activated in the absence of any other traffic, (2) pulling over to the right curb without signaling and stopping for another 40 seconds before pulling back into the roadway, again without signaling, (3) abruptly moving from the right lane to the left lane, again without signaling, to avoid a small patch of packed gravel that defendant admitted she drove past regularly (that is to say, the gravel patch was not a surprise hazard that would have excused defendant from signaling her abrupt lane change), and (4) moving from the right side of the road onto the left side of the road without signaling and driving on the left side

- 23 -

when it was unnecessary to do so to avoid other traffic.

¶ 106        Defendant explained that (1) she stopped because she believed she was being pulled over and resumed driving when she realized that she was not being pulled over and (2) she moved from the right lane to the left lane to avoid gravel that on past occasions "mess[ed] [her] tires up."

¶ 107        "[T]he existence of reasonable suspicion depends on the totality of the circumstances, and even if innocent explanations could exist for individual factors viewed in isolation, the factors viewed in combination may constitute reasonable suspicion." *People v. Biagi*, 2017 IL App (5th) 150244, ¶ 52, 68 N.E.3d 829; see *People v. Hill*, 2019 IL App (4th) 180041, ¶ 13, 123 N.E.3d 1236 (" 'A determination that reasonable suspicion exists *** need not rule out the possibility of innocent conduct.' " (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002))).

¶ 108        Moreover, although traffic stops are generally justified by probable cause, a traffic stop may also be justified by reasonable suspicion. *People v. Hackett*, 2012 IL 111781, ¶¶ 20, 28, 971 N.E.2d 1058. In *Hackett*, the police officer had reasonable suspicion to initiate an investigatory traffic stop when he "observe[d] multiple lane deviations, for no obvious reason." *Id.* ¶ 28. The purpose of the investigatory stop was to "inquire further into the reason for the lane deviation, either by inquiry of the driver or verification of the condition of the roadway where the deviation occurred." *Id.*

¶ 109        In the present case, however, we need not determine definitively whether Sturlic's observations of defendant's driving, alone, would have supported either probable cause or reasonable suspicion for an investigatory stop because Sturlic was operating on more than just her own observations; Sturlic also had the reliable citizen's tip that defendant was driving drunk. And, as we have repeatedly noted, whether reasonable suspicion exists to justify a traffic stop depends on the totality of the circumstances, that is, "the whole picture."

¶ 110    In this case, the totality of the circumstances clearly justified Sturlic's stop of defendant's vehicle. Sturlic received a nonanonymous tip through a police emergency number that defendant was intoxicated while driving a car with two children inside. The citizen identified the car and location with sufficient detail that Sturlic could be sure the car she stopped was the one the citizen identified. Sturlic followed the car to observe the driver, although she need not have done so given the reliability of the tip and danger that drunk drivers pose to the community. Although Sturlic arguably did not observe each element of a particular traffic code violation, defendant drove in an odd manner, corroborating the citizen's report that defendant was indeed driving while intoxicated. Under these circumstances, we have no difficult concluding that Sturlic's actions were justified and did not run afoul of the fourth amendment prohibition on unreasonable searches and seizures.

¶ 111                    III. CONCLUSION

¶ 112    For the reasons stated, the judgment of the trial court is affirmed.

¶ 113    Affirmed.

*People v. Johnson*, 2024 IL App (4th) 231185

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McDonough County, No. 22-DT-62; the Hon. Nigel D. Graham, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Maximillian Hughes-Zahner, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Matthew P. Kwacala, State's Attorney, of Macomb (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |